Filed 8/24/16  Stein v. Dept. of Fish and Wildlife CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PAUL STEIN et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>DEPARTMENT OF FISH AND WILDLIFE et al.,<br><br>    Defendants and Respondents. | C076561<br><br>(Super. Ct.<br>No. 34201100114371CUEIGDS) |

Appellants Paul and Jason Stein[1] appeal from the trial court's judgment of dismissal of their second amended complaint (SAC), following an order granting the respondents' (State of California, California Department of Fish and Game (DFG),[2]

---

[1]  Appellant Jason Stein is not an active party in this litigation.  For clarity, we treat Paul Stein (Stein) as the sole appellant.

[2]  The Department of Fish and Game changed its name to the Department of Fish and Wildlife after the events which gave rise to this action.

1

William Cox, Neil Manji, and John McCamman)[3] motion for summary judgment. The issues in this case involve Stein's sale of his trout farm, known as Kemoo Trout Farm (KTF). On appeal, Stein contends the trial court erred in granting summary judgment because: (1) the summary judgment motion was "irregular on its face"; (2) contrary to the trial court's ruling, he has standing to bring claims for the alleged unconstitutional taking of KTF; (3) neither failure to petition for administrative mandate nor the statute of limitations bars his claims; and (4) the trial court's evidentiary rulings excluding evidence presented in opposition to the motion for summary judgment were erroneous.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Facts Alleged by Stein

Various owners and operators have raised trout at KTF in Calaveras County since 1967. Stein owned and operated KTF from 1980 to 1997.[4]

In 1982, the DFG identified *Myxobolus cerebralis* (Mc) in waters supplying KTF. Mc is a parasite that can cause whirling disease under certain conditions. Whirling disease affects trout and was categorized as a serious disease in California Code of Regulations, title 14, section 245. The DFG's policy was to contain Mc within known infected water basins, and prohibit activities that could aggravate the parasite's impacts or increase its geographic distribution. The DFG allowed established aquaculturists to continue producing and distributing commercially infected fish under the conditions of a

---

[3] In 2007, William Cox was the supervising biologist of the Fisheries Branch, and reported to Neil Manji. Manji was the Fisheries Branch Chief of the DFG. John McCamman was first Chief Deputy Director, then Acting Director, of the DFG. We refer to the individual respondents by their last names, and the individual respondents and DFG collectively as respondents.

[4] In addition to being the owner of KTF, Stein was once employed by DFG, serving as an appointed chief deputy director of DFG for a year. He left that post in 2005.

2

compliance agreement generally designed to contain Mc and limit its potential impacts. However, the DFG sought to "not allow significant expansion of existing aquaculture facilities which test positive for whirling disease, nor to authorize any new facilities using whirling disease positive water sources."

In 1983, the DFG diagnosed Mc at KTF after finding rainbow trout infected with Mc spores in samples taken from the farm. The DFG subsequently quarantined the facility and destroyed the fish Stein had on hand at the time. Stein was compensated for this destruction of property, and he used the money to improve KTF in hopes of getting rid of Mc. In June of 1984, Stein entered into a compliance agreement that ran from July 1, 1984, to September 15, 1984, and provided interim measures until the DFG could conclude testing and surveillance and decide whether to allow reestablishment of "normal cultural and marketing operations." KTF resumed operation in 1984 and continued until December of 1996.

On May 14, 1987, the DFG renewed KTF's registration but imposed two conditions due to the known presence of Mc "in waters in the vicinity of" the facility.[5] The conditions required that tubifex worms, hosts for Mc that could facilitate the parasite's spread, be kept out of the facility. The conditions also limited stocking of trout from KTF to waters already known to be infected with Mc, subject to future disapproval by the DFG "if it is determined that such stocking poses a threat to fishery resources, private aquaculture or a general expansion of the range of [whirling] disease." The conditions applied to "all subsequent years of operation unless amended by written notice from the [DFG]."

In December of 1996, KTF was destroyed by a flood and rebuilt by Stein in its current form.

---

[5] In this document, and others, Mc and "whirling disease" are used interchangeably.

In 1997, Stein leased KTF to Don and Jan Stivers. The Stiverses operated KTF from 1997 to 2002. In or around June of 1999, the DFG learned that fish infected with Mc had been transferred from KTF to a Mc-free facility. On June 28, 1999, the DFG sent the Stiverses a letter informing them of the discovery and reminding them that the compliance agreement from 1987 prohibited such transfers.[6] In 1999, with KTF still "positive for Mc," the Stiverses entered into a compliance agreement. The 1999 compliance agreement contained conditions intended to "assure continued protection of the fishery resources of California, and minimize impacts to [KTF]." The agreement generally limited distributions of fish from Mc-positive sites; limited distributions of Mc-positive fish; prohibited "[f]acility expansion utilizing increased volumes of Mc-positive waters, to increase production and distribution of Mc-positive fish"; and expressly noted that "[n]ew or presently unregistered facilities utilizing Mc-positive waters will not be approved for registration or use." In his declaration, Stein referred to this agreement as an agreement that had been "revised" by DFG.

KTF was last operational in 2002. Thereafter, Stein did not renew the aquaculture license registration at KTF.

On March 6, 2006, Cox received a partial voicemail from Marlyss Hanson, a prospective buyer for KTF. Cox e-mailed Stein to obtain the buyer's contact information, and also said, "I shoul[d] talk to you about the existing compliance agreement. That would be re-written for the new owner, and I'd like to discuss that with you."[7] Stein replied, "I remember the compliance agreement and have apprised them of

---

[6] The record does not contain an actual compliance agreement dated 1987; this letter was likely referring to the registration conditions set forth in the DFG's registration letter to Stein on May 14, 1987.

[7] In full, the text of the Cox e-mail reads: "Paul [¶] I received half of a phone message from Martis? Hanson, who is a prospective buyer of your trout farm. Unfortunately the message was cut off before a phone contact was left. Do you have her contact

4

the whirling disease exposure. I believe in full disclosure so feel free to give them whatever they reasonably request."[8] In his declaration, Stein said he relied on Cox's "representation" in the e-mail, but he did not say that he contacted Cox to discuss the compliance agreement as Cox had requested. There is no other evidence in the record that Stein contacted Cox regarding how the compliance agreement would be rewritten or what conditions it would contain. Nor is there any evidence in the record that Stein and Cox had any other communication about the compliance agreement other than the March 6, 2006, Cox e-mail.

On or about June 21, 2007, Stein sold KTF to Deborah and John Coleman for $650,000; Stein held an installment note on the sale for $500,000. There is no evidence in the record that Stein informed Cox or anyone else at DFG about this buyer or that Cox or anyone else at DFG was otherwise informed of this sale before it occurred.

On August 2, 2007, John Coleman applied for an aquaculture registration permit with the DFG. On August 24, 2007, Cox e-mailed his superior, Manji, to express concerns about the Colemans' application. Cox wrote, "We have an issue here. This facility is whirling disease positive dating back to the early 1980's. It has not been registered for about 5 years, and now ownership, or operation, has changed. The new owner/manager is applying for registration. Normally, for new facilities we would not register a facility if we knew the product produced would be diseased. This approach has

_____

information for a follow up? Also, I shoul[d] talk to you about the existing compliance agreement. That would be re-written for the new owner, and I'd like to discuss that with you. [¶] Hope all is well. [¶] bc."

[8] With the exception of the requested contact information, the entirety of Stein's response reads: "Hey Bill. Marlyss Hanson can be reached @ [phone number omitted]. You can contact me at the number below. Yes I remember the compliance agreement and have apprised them of the whirling disease exposure. I believe in full disclosure so feel free to give them whatever they reasonably request. [¶] Thanks Bill. [¶] Paul Stein [Stein's contact information omitted]."

been used numerous times, especially in Mono and Inyo counties. Also, unwritten policy has been to not re-register [whirling disease] positive sites once their registration has expired. The idea being that eventually these positive sites would become inoperative and the State would benefit by not having diseased fish to plant. However, this smacks of underground regulation. [¶] To complicate things a little further, the site which was sold or leased was owned by former chief deputy director Paul Stein. A [whirling disease] compliance agreement was written for [KTF] in ~1983 which I believe is still en [*sic*] force. [¶] Resource-wise it would be best to not grant re-registration. Legal issues may come into play. I'm not sure if the property was sold, or is being leased. I'm also not sure if disclosure of the [whirling disease] issue was made by Paul."

On August 29, 2007, Cox indicated in another internal e-mail that he had spoken with Manji about the Colemans' application for registration. According to Cox, Manji did not want to register KTF because it would likely produce diseased fish. However, Cox noted, "Some language needs to include the willingness of DFG to test fish . . . since we have done this elsewhere prior to registration. . . . There is some chance that the facility has been dried up for the last 5 years and the pathogen has vanished. . . . We need to deal with all aquaculture registration applications in a consistent manner." Cox added, "There also seems to be some confusion as to who is the owner and who is the manager vs who is applying for the permit."

On October 2, 2007, McCamman emailed Stein and shared information he had received from Manji. The e-mail noted that Stein had been working under a compliance agreement but went on to say, "Once a facility is taken off line, and the permit expires, DFG has not re-issued permits. The reasoning is to limit the number of diseased fish from being raised and released into state waters. We do not permit new facilities if they have tested positive for [whirling disease]. Since [KTF] has been off line for several years and the permit has expired, we normally do not issue a permit to a new owner. We are willing to retest the facility to determine if being off line has reduced or eliminated

6

the [whirling disease] problem. If the facility is clean, then DFG would re-issue the permit." Stein urged the Colemans' application should not be "considered a new license since [KTF] has a previous history of 30 years of continuous operation," and he suggested treating the application as "a reissuance of the old permit" instead. Stein also indicated testing KTF would be a "waste [of] staff time" since whirling disease was endemic to the water source, but suggested "craft[ing] a compliance agreement that calls for the use of available technology to minimize exposure to [whirling disease], restrict future movement of product to waters know[n] to have [whirling disease] present and/or restrict trout raised at the facility to the dressed fish market."

McCamman replied, "I've got the permit application for a new permit in front of me now, and really there is no way we can consider [the Colemans' application] a renewal – a lapsed permit requires a new application. We have rejected applicants in similar circumstances previously, and are about to prospectively, so to make an exception here would cause us a world of hurt. As I indicated previously, we will place some fish in [KTF] and see what happens . . . alternately, there are other species, and in fact we MAY consider whirling disease resistant strains of trout, but this would have to go to the aquiculture advisory committee [AAC] for determination."

Stein replied, "John: I understand your dilemma. Let's try to work with the solution where [the Colemans] are allowed to work with [whirling disease] resistant strains, use ultraviolet lights to minimize infection, dressed trout market etc. Have Neil set up a consult with the AAC to discuss this option. Thanks again for your help."

McCamman forwarded Stein's e-mail to Manji and asked Manji to schedule the consult Stein requested. McCamman also said he explained to Stein that if the new operator wanted to look at disease resistant strains and water treatment, approval from the AAC would still be required and then stated, "He asked for [a] hearing. Please work directly with Paul, or perhaps directly with the applicant, on scheduling a place on the agenda for the [AAC], in the form of a permit appeal?" McCamman noted that

7

scheduling the "appeal" probably meant the DFG would have to first reject the Colemans' pending application.

On November 5, 2007, after KTF again tested positive for Mc, Manji informed the Colemans in writing that the DFG would issue their aquaculture registration, but "[t]o protect California's diverse fish populations," new conditions would be required, including: (1) incoming water would have to be irradiated with ultraviolet light; (2) only whirling disease resistant fish could be cultured; and (3) no live products were to leave KTF and only dead fish were to be marketed. These restrictions would not apply if species other than salmonids were cultured.[9]

On December 11, 2007, the Colemans e-mailed Stein that the new conditions created "an unexpected additional operating cost." The Colemans also said, "we believed we were buying the trout farm with no limitations except out [*sic*] ability to manage it. We are disappointed that we were not told of the [w]hirling's disease history." Stein replied, "I'm sorry to hear that Lannie[10] never fully disclosed the whirling disease issue.

---

[9] Manji's November 5, 2007, letter to the Colemans stated the following: "Thank you for your cooperation with Dr. Maret from our Fish Health Lab. Your fish farm at [address omitted] tested positive for whirling disease spores. To protect California's diverse fish populations, the Department requires specific conditions to alleviate our concerns about the spread of whirling disease. [¶] The Department will issue your Aquaculture Registration with the following conditions: [¶] 1) Incoming water shall be irradiated with ultraviolet light sufficient to kill TAMS and spores of [Mc]. [¶] 2) Only whirling disease resistant fish shall be allowed for culture; for salmonids, this is restricted to brown trout and Hofer strain rainbow trout. [¶] 3) No live products are to leave the facility. Fish are to be marketed dead to terminal food markets only. [¶] If species other than salmonids are to be cultured these restrictions do not apply. [¶] If you have any questions, please contact Dr. Joe Maret at [phone number omitted]."

[10] The reference to "Lannie" is apparently to Lannie Staniford, Stein's real estate agent. In his declaration, Stein stated that the Colemans sued him "for not disclosing whirling disease, a material fact, not exclusively for the DFG actions or policies, even though I did disclose these facts to the real estate agent."

8

She knew as does everyone in Calaveras County that whirling disease is in the Middle fork. That is specifically why I mentioned the compliance agreement with DFG in the disclosure document, and further stated that I made no representation that trout could successfully be raised at the facility. I was really under the impression that you both loved the property and the trout farm was merely a delightful addition. As for value, I knocked $100K off the previous year's asking price because Lannie represented you were motivated and really fell in love with the property. I had a good feel about you and determined this was a fair price. [¶] The trout farm can still be profitable but in the dressed or smoked market. Over time, with a clean bill of health, I'm certain you will be able to plant fish in whirling disease endemic areas, just as I did for over a decade." The Colemans continued to operate KTF under the conditions set forth in the November 5, 2007, letter.

The Colemans' aquaculture license registration expired on December 31, 2007. Around May of 2008, Stein e-mailed the Colemans that he met with DFG staff, including Cox, and they would offer "to put some test fish at the facility . . . immediately. This will get you started without any necessity for ultraviolent equipment. They have agreed that you can start a slow and incremental operational plan to return the hatchery to productivity."

From July to October of 2008, Garry Kelley, an associate fish pathologist with the DFG, conducted a preliminary study to evaluate the presence of Mc in rainbow trout at KTF. The study detected no Mc and observed no lesions typically associated with Mc development. The findings suggested low prevalence of Mc in KTF's water source. Due to the preliminary study's small sample size, however, Kelley noted the need for further investigation of whirling disease development at KTF.

From January to August of 2009, Kelley conducted a second, more expansive investigation into whirling disease at KTF. This second study again detected no Mc in trout from KTF.

9

It is unclear whether, and how, the DFG engaged in further deliberation over the conditions on KTF following these tests, but the Colemans continued to operate KTF under the conditions set forth in Manji's November 5, 2007, letter, including the prohibition against transporting or selling live trout. There was no date set by which they would be permitted to transport live fish and as far as the Colemans understood that condition would remain for the "foreseeable future." The Colemans asked DFG to make changes to the conditions, but DFG refused.

### The Coleman Action

On June 18, 2010, the Colemans filed suit against Stein for breach of contract and fraud. The complaint alleged the Colemans bought KTF "with a previously established fish farm that they could operate as a business raising and selling live trout to customers that [Stein] had established, continuing [Stein's] operation with the existing facilities," but Stein in fact sold "the property without a viable fish business, and with useless unsightly facilities that have to be removed."

The case settled on October 7, 2011. The settlement agreement lowered the original sale's installment note from $500,000 to $220,000. The Colemans also assigned their rights to any legal claims against the DFG to Stein.

### The Present Action

On November 21, 2011, Stein sued the DFG and DOES for inverse condemnation and deprivation of rights under section 1983 of title 42 of the United States Code.[11] The DFG demurred, arguing that the court had no jurisdiction over the inverse condemnation cause of action, and that the complaint failed to sufficiently plead either the inverse condemnation or section 1983 causes of action.

---

[11] Section 1983 refers to section 1983 of title 42 of the United States Code unless otherwise specified.

By stipulation, Stein submitted a first amended complaint (FAC), naming Cox, Manji, and McCamman as individual defendants. Respondents demurred again, claiming Stein failed to plead facts sufficient to constitute either an inverse condemnation cause of action or a section 1983 claim. The demurrer set forth three arguments: (1) both causes of action were barred by their respective statutes of limitations[12]; (2) respondents' actions did not deprive Stein of all reasonable use of KTF; and (3) the section 1983 action against individual respondents in their official capacities was not actionable as a matter of law.

In opposition to respondents' demurrer, Stein claimed the facts giving rise to his causes of action did not come to light until October 2011. Stein also contended respondents were estopped from relying on statutes of limitations, because respondents fraudulently concealed facts essential to the causes of action against them. Additionally, Stein argued conditions imposed on KTF operations constituted "a de facto taking of the business in it's [*sic*] entirety, because the business was one of selling, transporting and planting live trout," and in any case damage to "less than all" of KTF, i.e., damages reflecting a diminution in value would still be compensable. Finally, Stein claimed the individual respondents, "exercising and abusing arbitrary and capricious authority without any basis in logic, law or fact, arbitrarily and capriciously destroyed [his] business in its entirety," and were thus liable under section 1983 for deprivation of constitutional rights.

The trial court overruled the demurrer as to inverse condemnation, finding Stein's arguments could "be construed to state equitable estoppel barring [respondents] from

---

[12] Specifically, the statute of limitations was three years for inverse condemnation and two years for section 1983; respondents argued that both accrued in 2007 because the DFG's restrictions on KTF operations were implemented in November of 2007, and the Colemans notified Stein as to these restrictions in December of 2007.

11

raising the statute of limitations as a defense." The court also ruled that "a governmental taking can occur absent denial of all economically beneficial use of property."

The trial court also overruled the DFG's demurrer as to the section 1983 claim. Based on the aforementioned analysis, the court found that respondents were not entitled to demurrer based on a statute of limitations defense. The court sustained the demurrer with leave to amend as to the individual respondents because "state officials acting in their official capacities are not 'persons' within the purview of 42 U.S.C. § 1983 and cannot be sued as such for damages."

Stein filed a second amended complaint (SAC), with additional allegations that respondents "acting individually, and as the State of California and it's agency, the [DFG]," took actions that functionally shut down Stein's business at KTF.

Thereafter, respondents moved for summary judgment. They argued that Stein lacked standing to bring an inverse condemnation action because he failed to petition for a writ of administrative mandate; the action was untimely; KTF had no value anyway because it was sold as "vacant land"; and individual respondents could not be liable for inverse condemnation as a matter of law, because individuals do not have the power of eminent domain. Respondents further argued that Stein lacked standing to bring a section 1983 claim because he had no property interest in KTF at the time of the alleged violation, and a section 1983 claim involves a violation of individual rights that cannot be assigned; the action was untimely; and individual respondents were entitled to qualified immunity.

In opposition, Stein argued that respondents were estopped from relying on his failure to petition for a writ of administrative mandate, since respondents' actions misled him as to the final nature of conditions imposed on KTF. Stein further argued that administrative mandate would be an inadequate remedy in any case, because it could not restore his rights after final settlement with the Colemans. Similarly, Stein repeated that respondents could not rely on timeliness issues because respondents misrepresented the

final nature of conditions imposed on KTF.  Additionally, Stein repeated conclusory assertions that KTF had value as a business regardless of how it was sold; the individual respondents are liable; and the Colemans assigned their rights to sue to Stein.

The court granted respondents' motion for summary judgment.  As to the inverse condemnation cause of action, the court found that the Colemans, who owned KTF at the time of the alleged violation, believed the conditions imposed to be final,[13] and no one ever filed a petition for a writ of administrative mandate.  Thus, the court concluded, the Colemans had forfeited their right to an inverse condemnation action, and had no such right to assign to Stein.

As to the section 1983 claim, the court found that Stein provided no legal or factual support for his contention that he had any claim against respondents except by assignment from the Colemans.  The court concluded Stein could not maintain an action for deprivation of property, since he did not actually own KTF at the time of the alleged violation.  Similarly, because the Colemans believed the conditions on KTF to be final, the court rejected Stein's estoppel argument because the Colemans would not be able to assert such argument against respondents' claim that the statute of limitations for a section 1983 action had run.

The court considered evidentiary objections from both parties.  The court overruled all of Stein's objections to respondents' evidence and statement of undisputed facts.  The court sustained some of respondents' objections to Stein's evidence.  The court did not consider the inadmissible evidence in deciding respondents' motion for summary judgment.

---

[13]  The trial court noted Deborah Coleman indicated her understanding that the November 5, 2007, letter from Manji was the DFG's final decision, citing her deposition testimony where she said the DFG " 'wouldn't change anything on it.  We asked.' "

13

## DISCUSSION

We review the trial court's grant of summary judgment de novo, applying the same rules and standards that govern a trial court's determination of the motion. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 (*Carnes*).) We consider all the facts that were before the trial court, including evidence set forth in the moving and opposing papers, except that to which objections were made and sustained. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Ibid.*)

### I. Asserted Summary Judgment Procedural Irregularities

### A. The Parties' Contentions

Stein contends respondents' "motion for summary judgment was irregular on its face and should have been denied" for that reason. Stein alleges two irregularities. First, he complains that respondents relied on the same fifteen "multi-part repetitive and redundant" facts to support each of nine identified issues in their motion for summary judgment. Second, he essentially argues that respondents' claims to immunity fail because respondents failed to contest "evidence of misconduct, abuse of discretion, waiver, misrepresentation, and concealment" to overcome Stein's assertion of estoppel.

Respondents assert that basing multiple grounds for summary judgment on the same facts is not reason to deny summary judgment, and Stein failed to explain "how or why the undisputed material facts submitted in the [motion for summary judgment] fail to support summary judgment on qualified immunity grounds."

### B. Analysis

We agree with respondent that Stein has not shown irregularities in the motion for summary judgment that would have warranted denying the motion.

Stein cites Code of Civil Procedure section 437c, subdivision (b)(1), in support of his claim of irregularities. That provision requires that supporting papers to a motion for

14

summary judgment include a separate statement of undisputed material facts, and provides that " 'failure to comply with this requirement . . . may in the court's discretion constitute a sufficient ground for denial of the motion.' " (Code Civ. Proc., § 437c, subd. (b)(1).) Stein did not, however, specifically explain how respondents' motion failed to comply with this requirement. In fact, in the sentence immediately following this citation, Stein states, "The fact-intensive nature of the motion and the disputed issues of material fact can nowhere better be shown than by *moving party's own voluminous Separate Statement of Undisputed Material Facts in Support of the Motion for Summary Judgment*." (Italics added.) Since Stein acknowledges that respondents submitted a separate statement in support of their motion, it is unclear how Code of Civil Procedure section 437c, subdivision (b)(1), supports his position on appeal. Stein carries the burden to clearly state the issues on appeal and make coherent legal arguments. (Cal. Rules of Court, rule 8.204(a)(1)(B)-(C); see also *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2.) To the extent he cites authority without argument, the citations are not considered and do not merit discussion on appeal. (See, e.g., *In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

The only argument on this point we can discern from Stein's brief is that respondents' use as to each ground for summary judgment of "multi-part repetitive and redundant" facts constitutes a " 'failure to comply' " with the requirement of Code of Civil Procedure section 437c, subdivision (b)(1), such that the trial court should have denied respondents' motion for summary judgment on that basis. But even if we considered this argument, it is meritless. First, Stein provides no legal support for his contention that use of the same facts to support multiple grounds for summary judgment is "irregular" and thus grounds for reversal. Second, even assuming arguendo that respondents' separate statement failed to comply with the requirement to set forth facts "plainly and concisely," the decision whether to deny the motion on that basis is "in the [trial] court's discretion." (Code Civ. Proc., § 437c, subd. (b)(1).) Where a trial court is

15

required to exercise its discretion in ruling on a Code of Civil Procedure section 437c motion for summary judgment, we review that decision for abuse of discretion. (*GuideOne Mutual Ins. Co. v. Utica National Ins. Group* (2013) 213 Cal.App.4th 1494, 1501; *Whitehead v. Habig* (2008) 163 Cal.App.4th 896, 901.) Stein makes no argument that the trial court abused its discretion in granting respondents' motion for summary judgment despite a supposedly deficient separate statement of undisputed material facts. Stein's argument thus fails to show reversible error based on Code of Civil Procedure section 437c, subdivision (b)(1).

Stein's second asserted irregularity is not a procedural irregularity with respondents' motion for summary judgment, but rather a substantive argument that respondents should be estopped from raising a statute of limitations defense. As such, we address it in our discussion of the section 1983 action, *post*.

## II.     Evidentiary Rulings

In the last argument in his opening brief, almost as an afterthought, Stein seeks reversal of the trial court's evidentiary rulings sustaining many of respondents' objections to the declarations of Stein and Richard Reynolds. Unlike Stein, we address this before turning to the causes of action because the evidentiary rulings shape the record before us on appeal.

" 'The trial court is "vested with broad discretion in ruling on the admissibility of evidence," ' " and its " ' "ruling[s] will be upset only if there is a clear showing of abuse of discretion." ' " (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1513.) The trial court abused its discretion if, " 'in light of the applicable law and considering all relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice.' " (*Safeco Ins. Co. of America v. Superior Court* (2009) 173 Cal.App.4th 814, 832.) We presume the trial court properly applied the law and acted within its discretion unless Stein affirmatively shows otherwise. (*Id.* at pp. 832-833.)

16

Here, Stein does not challenge any specific evidentiary ruling, but recites various details from his declaration. The relevance of these recitations is unclear, but Stein appears to argue that conflicts between his testimony and the Colemans' testimony raise a "triable issue of material fact as to the credibility of the witnesses." Thus, we discern his argument to be that the court erred in deciding the issue -- i.e., determining that the Colemans were more credible than Stein -- instead of merely noting that a triable issue of material fact precluded summary judgment.

Stein's argument, as we understand it, is meritless. First, there is no evidence that the trial court made any factual determination as to the relative credibility of Stein and the Colemans. Indeed, inconsistent with their credibility argument, Stein argues elsewhere in his briefing that the trial court's evidentiary rulings lacked accompanying reasoning. Second, Stein does not challenge the bases of any objections to his declaration, nor does he assert that the trial court abused its discretion in sustaining such objections on those bases. Stein's argument that the trial court erroneously disregarded a triable issue of material fact speaks to the merits of his inverse condemnation cause of action, not to the correctness of the trial court's evidentiary rulings. Insofar as Stein's arguments are relevant to the inverse condemnation cause of action, we address them *post*.

Stein also requests reversal because the trial court "sustained blanket objections." While the trial court explained some of its rulings, it simply noted that other objections were "SUSTAINED." Stein's opening brief cites *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255 (*Nazir*), and *Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1449 (*Twenty-Nine Palms*), for the proposition that blanket rulings, sustaining objections without explanation, constitute abuse of discretion. Neither case holds that summarily sustaining numerous objections categorically constitutes an abuse of discretion. Nor has Stein cited any case that so holds. Indeed, *Nazir* and *Twenty-Nine Palms* are both distinguishable from the instant case.

17

In *Nazir*, the trial court sustained 763 out of 764 defense objections. (*Nazir, supra*, 178 Cal.App.4th at p. 255.) The reviewing court found there was "no way that the trial court could properly have sustained 763 objections ' " 'guided and controlled . . . by fixed legal principles.' " ' " (*Ibid.*) The *Nazir* court cited several reasons for its conclusion. The court emphatically observed that some of the sustained objections "did not even assert any basis for the objection!" (*Id.* at p. 256.) Other objections were to the plaintiff's testimony about things like his religion or skin color. (*Ibid.*) Over 250 of the sustained objections failed to even quote the evidence objected to. (*Ibid.*) Twenty-seven objections were to the plaintiff's brief rather than his evidence. (*Ibid.*) Many of the sustained objections were obviously frivolous. (*Ibid.*) And the reviewing court determined that the one objection the trial court overruled should have been sustained, at least in part. (*Id.* at p. 257.) Under these extreme circumstances, the reviewing court concluded the trial court's evidentiary rulings were "a manifest abuse of discretion." (*Ibid.*)

*Nazir* does not, however, stand for the proposition that the issuance of a blanket ruling sustaining multiple objections constitutes abuse of discretion as a matter of law. Nothing like the facts in *Nazir* is present here, nor does Stein assert any parallel between *Nazir* and this case aside from the mere fact that many objections were made and sustained. Here, the number of summarily ruled-upon objections was much smaller than it was in *Nazir*. Moreover, unlike in *Nazir*, the trial court did not issue a purely blanket ruling but, in disposing of over 100 defense objections, identified every objection overruled and every objection sustained. Apart from sustaining objections on the grounds asserted, the court also specifically explained why it sustained one particular objection on grounds other than what respondents argued. Unlike in *Nazir*, Stein has not shown here that any significant portion of the sustained objections was clearly frivolous or unreasonable. In short, the trial court's evidentiary rulings in this case are not comparable to the rulings in *Nazir* that constituted a manifest abuse of discretion.

*Twenty-Nine Palms* is likewise distinguishable from the instant case. There, as in *Nazir*, the reviewing court concluded "the trial court's blanket ruling sustaining all the objections, without reasoning, was an abuse of discretion." (*Twenty-Nine Palms, supra*, 210 Cal.App.4th at p. 1449.) Again, there was more to the analysis than the mere fact that the trial court issued blanket evidentiary rulings. The reviewing court in *Twenty-Nine Palms* based its conclusion on, inter alia, the "sweeping nature of the objections," and specific examples where it appeared the trial court sustained unreasonable objections or did not consider individual objections. (*Id.* at pp. 1447-1449.) Again, Stein has not shown similar objections by the opposing party or rulings by the trial court here. Furthermore, while the reviewing court in *Twenty-Nine Palms* determined that "the objections in [that] case needed individual attention," it also specifically observed that "summarily ruling on numerous evidentiary rulings is a common labor-saving practice in law and motion courts." (*Id.* at p. 1447.) This acknowledgement, while not expressly endorsing the "common labor-saving practice," at least contradicts Stein's suggestion that the mere act of summarily ruling on numerous evidentiary rulings, in and of itself, constitutes abuse of discretion.

Even if Stein had shown that the trial court abused its discretion in sustaining any of respondents' objections, such error would not require reversal. To obtain a reversal on appeal, Stein must show that the error was prejudicial. (Cal. Const., art. VI, § 13; *Carnes, supra*, 126 Cal.App.4th at p. 694.) "[A]n erroneous evidentiary ruling requires reversal only 'if there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Twenty-Nine Palms, supra*, 210 Cal.App.4th at p. 1449.)

Here, as we have noted, Stein has not challenged any specific evidentiary ruling. In a sense, his contention on appeal can be viewed as a "blanket" assertion of error. And Stein has not asserted, much less shown, that he was prejudiced by any specific alleged error or combination of alleged errors related to any of the trial court's evidentiary

19

rulings.  We conclude that here, as in *Twenty-Nine Palms,* any error in the trial court's evidentiary rulings would not change the outcome of respondents' summary judgment motion because Stein failed to create a triable issue of fact, as we explain *post*.  (*Twenty-Nine Palms, supra*, 210 Cal.App.4th at p. 1449.)

## III.    Inverse Condemnation

## A.  The Parties' Contentions

Respondents contend Stein should be estopped from asserting KTF had any business value at the time of the alleged taking.  Moreover, respondents argue that Stein lacks standing to bring an action for inverse condemnation because he failed to petition for a writ of administrative mandate, and the action is in any case untimely and barred as a matter of law.  Finally, respondents claim Stein cannot bring an inverse condemnation action against individual respondents as a matter of law.

Stein raises two possible theories of why he has standing to bring this cause of action.  First, there is the assignment of rights from the Colemans, which Stein characterizes as merely a precaution.  Under this theory, he alleges the new conditions respondents imposed on the Colemans' operation of KTF "effectively ended the business" and amounted to an unconstitutional taking.  Second, Stein claims he has independent standing to sue for inverse condemnation because respondents' decision to impose new conditions on the Colemans diminished the property value of KTF -- i.e., what Stein could get for selling the property -- and amounted to an unconstitutional taking of the sale value of KTF.  Specifically, Stein contends he sold KTF "only after he was assured the Compliance Agreement would be re written [*sic*] for new owners."

Additionally, Stein suggests in his opening brief and elaborates in his reply brief that respondents misled him into thinking he (1) could sell KTF at full value because the new owners would be allowed to operate KTF under Stein's compliance agreement, and (2) did not need to pursue administrative remedies because the conditions imposed on the Colemans would be lifted in the future.  Thus, Stein contends, respondents should be

20

estopped from arguing that nonexhaustion of administrative remedies or untimeliness bars his cause of action under his second theory of standing.

## B. Analysis

### 1. Respondents' Claim of Estoppel

Respondents contend Stein cannot claim any loss of value as a result of the alleged "taking" because "he maintained as an undisputed fact in the Coleman action that [KTF] had no value whatsoever." Stein in his reply brief essentially argues that although KTF was sold as vacant land rather than as an ongoing business, its potential for trout farming operations was nonetheless understood to be a significant part of its value; and in any case Stein is not estopped by his arguments in the Coleman action from claiming damages in the instant case.

Respondent's estoppel claim was raised before the trial court. However, the trial court disposed of the inverse condemnation cause of action on the basis that Stein failed to petition for a writ of administrative mandate, and did not reach this estoppel issue.

As a preliminary matter, respondents did not cite any legal authority to support their estoppel argument here, nor did they specify what kind of estoppel is in dispute. "Where a point is raised in an appellate brief without . . . legal support, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' " (*Juror Number One v. Superior Court* (2012) 206 Cal.App.4th 854, 865.)

Even if we considered respondents' argument, it would be insufficient to defeat Stein's claim for inverse condemnation. Respondents' argument most closely resembles an assertion of judicial estoppel. " 'Judicial estoppel is an equitable doctrine aimed at preventing fraud on the courts' " by "prohibit[ing] a party from taking inconsistent positions in the same or different judicial proceedings." (*M. Perez Co., Inc. v. Base Camp Condominiums Assn. No. One* (2003) 111 Cal.App.4th 456, 463.) Judicial estoppel applies when: "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in

21

asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183.) Respondents' apparent assertion of judicial estoppel fails to meet the third and fourth requirements. We discuss those requirements in reverse order.

In the Coleman action, Stein asserted that KTF had not been sold as an ongoing business as an "alternative, provisional defense" to the Colemans' claim that they purchased an existing business. In this action, Stein does not assert that KTF was sold as an ongoing business; in fact, he admits it was sold as "vacant land" but explains that this did not reflect KTF's primary value as a potential trout farming operation.

For judicial estoppel to apply, the seemingly conflicting positions "must be clearly inconsistent so that one necessarily excludes the other." (*Coleman v. Southern Pacific Co.* (1956) 141 Cal.App.2d 121, 128.) The alleged conflict here is not so clear. Stein can consistently assert both that KTF was not an *ongoing* business when the Colemans bought it, and that the Colemans bought KTF as a *potential* business.

Moreover, where a litigant was unsuccessful in asserting the first position, a subsequent inconsistent position introduces no risk of inconsistent court determinations and thus is not barred by judicial estoppel. (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1245-1246.) Here, Stein did not prevail in the Coleman action, and there was no judicial determination as to what KTF was in fact worth. While "there is no hard and fast rule which limits application of [judicial estoppel] to those situations where the litigant was successful in asserting the contrary position," the doctrine "should be applied to an unsuccessful litigant only in the rare situation where the litigant has made an egregious attempt to manipulate the legal system." (*Thomas v. Gordon* (2000) 85 Cal.App.4th 113, 118-119.) Neither the record nor respondents' brief shows any such egregious attempt here. Judicial estoppel is

22

therefore unnecessary in this case to protect the integrity of the judicial process. (See *Tuchscher*, at p. 1245.)

### 2. Standing/Writ of Administrative Mandate Requirement

Whether Stein has standing by virtue of assignment from the Colemans, or independent standing on the theory that his investment in the value of KTF was the unconstitutionally taken property, owners of property suing for inverse condemnation following an alleged taking must have first petitioned for a writ of administrative mandate. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 27-28 (*Hensler*).) Here, neither the Colemans nor Stein ever did so. Thus, under either theory of standing, the failure to exhaust administrative remedies would bar Stein's inverse condemnation cause of action. (See *Hensler*, at pp. 16-17.)

Stein's first theory of standing fails because the Colemans understood the regulations at issue to be final as of November 5, 2007, but never petitioned for a writ of administrative mandate. The Colemans thus waived their inverse condemnation claim against respondents, and consequently had no such claim to assign to Stein. We discuss Stein's second theory of standing further in the context of his estoppel claim.

### 3. Stein's Claim of Estoppel

Stein claims his failure to exhaust administrative remedies should not preclude him from asserting independent standing to sue, because respondents should be estopped from asserting nonexhaustion. The equitable estoppel doctrine "provides that a person may not deny the existence of a state of facts if he [or she] intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his [or her] detriment." (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725.) The elements of equitable estoppel are: (1) the party to be estopped must be apprised of the facts; (2) the party to be estopped must intend that his or her conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely

23

upon the conduct to his or her injury.  (*Ibid*.)  The detrimental reliance must be reasonable.  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 35.)

Moreover, where, as here, equitable estoppel is asserted against the government, the doctrine is inapplicable if the court determines that the avoidance of injustice in the particular case does not justify the adverse impact on public policy or the public interest. (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496-497 (*Mansell*).)

We look first to the ordinary elements of equitable estoppel.  Applying Stein's allegations to the elements, we can discern two possible bases for equitable estoppel:  (1) if respondents led Stein to sell KTF upon the reasonable belief that his compliance agreement would be transferred to the new owners, and (2) if respondents led Stein to forego pursuing administrative remedies by assuring him that the new conditions imposed on the Colemans were temporary.  Neither basis justifies the application of equitable estoppel because Stein consistently misrepresents respondents' actions to suit his interpretation.

Stein has not established the second and fourth elements of equitable estoppel with respect to his decision to sell KTF.  Stein alleges Cox said, in one e-mail, that his compliance agreement "would be re-written for the new owner."  Stein points out Cox characterized the wording of his e-mail as a "mistake" during his deposition.  Since this mistake in wording is the only alleged misconduct, Stein has not established the second element of equitable estoppel because there is no evidence that Cox *intended* to mislead Stein into thinking the compliance agreement would be transferred.

Nor can Stein establish the fourth element of equitable estoppel, because the record contradicts his claim that he sold KTF in reliance on some assurance of the Colemans' ability to plant trout.  When the Colemans informed Stein of the new conditions imposed on KTF, and expressed disappointment that they "were not told of the [Mc] history," Stein replied that the Mc issue "is specifically why . . . [he] made no representation that trout could successfully be raised at the facility.  [He] was really under

24

the impression that [the Colemans] loved the property and the trout farm was merely a delightful addition." Thus, by Stein's own account, in selling KTF he did not actually rely on any perceived guarantee by respondents that the Colemans would be able to operate KTF under the same conditions that Stein once did.

Even if Stein had relied on Cox's e-mail as an assurance that the compliance agreement would be transferred, such reliance was unreasonable. Stein characterizes Cox's statement as an *assurance* that the compliance agreement would "transfer" to new owners. But Cox did not use the word "transfer." He used the word "re-written." Indeed, Cox testified in a deposition that his "intent in writing this [e-mail] was to let [Stein] know that the existing compliance agreement would be different for – the set of restrictions would be different for a new owner than they were for the current owner."[14] He also testified that "[a] transfer of a compliance agreement from one owner to another had never occurred for trout farmers in California."

Cox's statement in the e-mail cannot be reasonably viewed as an assurance of anything, let alone an assurance that the compliance agreement would be transferred, since Cox's statement included a request to discuss the matter. As noted, the word "transfer" was not used; Cox used the word "re-written." Pertinent definitions of the word "rewrite" as used in this context include: "to write (something) again especially in a different way in order to improve it or to include new information"; "to make a revision of (as a story)"; "cause to revised: as [¶] . . . [¶] to alter (previously published material) for use in another publication"; "to revise something previously written." (Merriam-Webster's Dictionary <http://www.merriam-webster.com/dictionary/rewritten> [as of

---

[14] Regarding Cox's characterization of his wording as a "mistake," Stein blames Cox for not contacting Stein about this mistake. But whether it was a mistake or not to use the word "re-written," that word was still ambiguous, such that Stein's professed reliance thereon was unreasonable.

Aug. 24, 2016].) Thus, the word "re-written" reasonably could have meant new conditions for any new owners. Further clarification along the lines of what Cox said in his deposition testimony may have been forthcoming had Stein discussed the matter with Cox as Cox had requested. But Cox testified that he had no recollection of discussing the rewrite with Stein, and there is no evidence in the record that such a conversation took place. Because Stein did not respond to Cox's request to discuss the matter, he could not reasonably rely on Cox's email as an assurance the compliance agreement would be transferred, especially given the plain meaning of the word "re-written."

Moreover, the inclusion of different conditions is consistent with respondents' past handling of KTF. Stein referred to the 1999 agreement written after the Stivers leased KTF as an agreement that had been "revised" by DFG. And that agreement did in fact include revisions to Stein's 1987 registration. For example, the tubifex worm prohibition in the 1987 document is not in the 1999 document. While the stocking of trout was limited to four specific rivers by name and several specific areas in those rivers in the 1987 document, the 1999 document more generally restricted distributions of fish from KTF to: "1. . . . historical markets in non-enzootic waters where continued distributions of Mc-positive stocks are not considered by [DFG] to be a significant risk to wild fish, as determined after consultation with the Fish Disease Advisory Committee, if necessary" and "2. . . . Mc-positive water basins, or into waters where no year-round populations occur." The 1999 document also expressly prohibited distributions of Mc-positive fish "within enzooic waters supplying [DFG] or commercial production facilities, or waters containing threatened or endangered salmonids, without specific written authorization from the [DFG]" and "where Mc is not presently known, or where recent sampling efforts cannot detect past infections." These specific prohibitions are not in the 1987 document. The 1999 document also included an express prohibition against "[f]acility expansion utilizing increased volumes of Mc-positive waters[] to increase production and

26

distribution of Mc-positive fish." No such prohibition can be found in the 1987 document.

Furthermore, the potential for subsequent amendment was noted in the 1987 document. It reads, "The above special conditions and restrictions apply to 1987 and all subsequent years of operation *unless amended* by written notice from the [DFG]." (Italics added.) Additionally, the 1999 document lists as one of the five conditions, "New or presently unregistered facilities utilizing Mc-positive waters will not be approved for registration or use." That notice was not in the 1987 document.

In summary, it was not reasonable for Stein to rely on Cox's statement about the need to rewrite the compliance agreement as an assurance the agreement would simply be transferred to new owners without any changes to the conditions given the following: (1) the differences in the conditions between the 1987 and 1999 documents; (2) an express statement in the 1987 document indicating the possibility of future amendments; (3) Stein's own reference to the 1999 document as a "revised" agreement; and (4) Cox's overture to discuss the rewrite for a prospective buyer and the lack of evidence Stein ever followed through on that request. Stein cannot establish the fourth element of equitable estoppel -- reasonable reliance.

Stein similarly has not established the second and fourth elements of equitable estoppel with respect to his decision to forego administrative remedies. Stein contends he did not seek an administrative remedy with the DFG or petition for writ of mandamus because the conditions imposed on the Colemans were only temporary and were never final. In support of this argument, Stein focuses on Manji's November 5, 2007, letter in which those conditions were set forth. But the word "temporary" cannot be found in Manji's letter and there is nothing in the letter from which one could infer the conditions were temporary. (See fn. 9, *ante*.) Nor does any other document in the record say the conditions were temporary. Moreover, as for the condition prohibiting planting of live fish, the Colemans stated there was no date set by which they would be permitted to do so

and as far as they understood that condition would remain for the "foreseeable future." The Colemans asked DFG to make changes to the conditions, but DFG refused.

Stein claims respondents "repeatedly confirmed" and "promised" the temporariness of the conditions imposed on the Colemans, but the evidence he cites shows no such promise or confirmation. Stein cites to his own declaration, wherein he claims the procedures used in this case had never been used before in his own experience with the DFG, and to some purported confusion between respondents' uses of the terms "compliance agreement" and "registration." The fact that Stein was personally unfamiliar with respondents' registration practices, or that respondents sometimes used the terms "compliance agreement" and "registration" interchangeably, hardly amounts to an affirmative and intentional *promise* by respondents that the conditions imposed on the Colemans were temporary. If Stein relied on these dubious bases in believing the conditions were temporary, and thereby did not pursue administrative remedies, such reliance was unreasonable. Moreover, even if the decision to forgo administrative remedies was a foreseeable and reasonable consequence of Stein's belief that the conditions imposed on the Colemans were temporary, Stein still has not shown that respondents *intentionally* caused him to have such a belief.

Stein also cites as evidence of a so-called "promise" by respondents the fact that the Colemans were in a sort of "trial period," i.e., "a slow and incremental operational plan to return the hatchery to productivity." These are Stein's words, not respondents, but assuming arguendo these words were respondents', this is still insufficient to show that respondents intentionally caused Stein to forego administrative remedies by leading him to believe the conditions imposed on the Colemans were temporary. A trial period is no guarantee of a change in conditions, since the whole point of a trial period and accompanying testing is ostensibly to see *if* a change in the conditions is warranted. Indeed, Stein stated in his declaration that the trial period, as he understood it, was to give the Colemans a chance to "show[] the ability to successfully raise trout at the facility."

28

Thus, given the reason for the trial period, the conditions may have never been lifted without the Colemans proving themselves. Stein points to his e-mail to the Colemans of December 12, 2007, in which he told them, "Over time, with a clean bill of health, I'm certain you will be able to plant fish in whirling disease endemic areas, just as I did for over a decade." But Stein did not speak for respondents, and his representations to the Colemans did not constitute or reflect any promise or guarantee from respondents.

If Stein failed to pursue administrative remedies in reliance on this tortured interpretation of the Colemans' trial period, such reliance was unreasonable. Stein states, "It would have made no sense" to sell KTF and "continue trout farming activities if the conditions were permanent," apparently in an attempt to prove by *reductio ad absurdum* his claim that the conditions were temporary. Accepting as a premise, however, that selling KTF and "observ[ing] the Colemans continuing to conduct trout farming operations" "made no sense" if there was no guarantee that the conditions were temporary, it does not follow that the conditions must then have been temporary. Rather, it further bolsters our conclusion that Stein's decisions to sell KTF and tell the Colemans they could continue trout farming operations, despite the inherent uncertainty of a trial period and the possibility that the conditions could be permanent, were unreasonable. Again, Stein cannot establish the reliance element of his equitable estoppel claim. Thus, no matter how we view the record, there is no triable issue of fact as to the application of equitable estoppel to excuse Stein's failure to exhaust administrative remedies and file a petition for writ of mandate.

Moreover, even assuming Stein demonstrated the elements for an ordinary assertion of equitable estoppel, the doctrine would be inapplicable here because Stein has not shown that the avoidance of injustice in this case justifies the adverse impact on public policy or the public interest. (*Mansell, supra*, 3 Cal.3d at pp. 496-497.) The purported injustice at stake here is limited because, by Stein's own account, he was the only one injured in this entire case. And, as we discussed *ante* and will discuss further

29

within the context of Stein's section 1983 claim, *post*, the dearth of evidence of any wrongful or unfair conduct by respondents further mitigates the potential injustice at issue. On the other hand, the public interest implicated is significant because, as Stein concedes, phasing out Mc positive sites to benefit the State by preventing planting of diseased fish is a "supportable or reasonable" goal.

Additionally, the public policy behind requiring exhaustion of administrative remedies in cases like this one weighs against Stein. As the trial court noted and our Supreme Court has explained, "The purpose of statutes and rules which require that attacks on land-use decisions be brought by petitions for administrative mandamus, and create relatively short limitation periods for those actions, and actions which challenge the validity of land use statutes, regulations, and/or decisions, is to permit and promote sound fiscal planning by state and local governmental entities." (*Hensler, supra*, 8 Cal.4th at p. 27.) Specifically, " 'The requirement that challenges to administrative actions constituting takings be brought initially by administrative mandamus assures that the administrative agency will have the alternative of changing a decision for which compensation might be required. If no such early opportunity were given, and instead, persons were permitted to stand by in the face of administrative actions alleged to be injurious or confiscatory, and three or five years later, claim monetary compensation on the theory that the administrative action resulted in a taking for public use, meaningful governmental fiscal planning would become impossible.' " (*Id.* at pp. 27-28, quoting *Patrick Media Group, Inc. v. California Coastal Com.* (1992) 9 Cal.App.4th 592, 612.) Thus, having weighed the policy concerns implicated by Stein's assertion of equitable estoppel, we conclude the doctrine should not be applied in this case. (See *Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.)

### 4. Taking versus Diminution in Value

As a final point relevant to Stein's assertion of independent standing, we note that, even if equitable estoppel applied to excuse Stein's failure to exhaust administrative

remedies, he still would not prevail on the cause of action for inverse condemnation. " 'To state a cause of action for inverse condemnation, the property owner must show there was an invasion or appropriation (a "taking" or "damaging") of some valuable property right which the property owner possesse[d] by a public entity and the invasion or appropriation directly and specially affected the property owner to his injury.' " (*City of Los Angeles v. Superior Court* (2011) 194 Cal.App.4th 210, 221.)  Stein claims "the value" of his "investment [in KTF] was taken by the state."  Thus, he argues, he has independent standing to sue "for loss in [the] value of [KTF]."  However, even assuming Stein had a property right in the sale value of KTF, and such value was diminished by respondents' actions prior to the sale to the Colemans, mere diminution in the value of property does not suffice to support an inverse condemnation cause of action.  (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 942 ["[A] diminution in property value is not a 'taking or damaging' of the property, but an element of the measure of just compensation when such taking or damaging is otherwise proved."]; *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 518 ["a zoning action which merely decreases the market value of property does not violate the constitutional provisions forbidding uncompensated taking or damaging"]; *Scott v. City of Del Mar* (1997) 58 Cal.App.4th 1296, 1307 [diminution of the value of homes after city's removal of adjacent seawall and riprap on public land was not a taking].)

In sum, whether Stein stands in his own shoes or those of the Colemans, failure to exhaust administrative remedies bars his inverse condemnation cause of action. Moreover, under Stein's independent standing theory, his inverse condemnation cause of action would also fail because he did not show a "taking" of any valuable property right aside from diminution in the property or sale value of KTF.

31

## IV.    Section 1983

### A. The Parties' Contentions

Stein mentions his section 1983 claim only in a single reference to "defense claims of 'immunity' " under the argument that respondents' motion for summary judgment was irregular. Stein states: "Moreover, despite the defense claims of 'immunity' on the part of the individual defendants and having already at least twice in briefing on demurrer encountered plaintiffs' claims of delayed accrual, waiver and estoppel to raise statute of limitations defenses, defendants offered not a single declaration or reference to their own deposition testimony or documents produced by them contesting plaintiffs['] evidence of misconduct, abuse of discretion, waiver, misrepresentation, and concealment." As noted *ante*, though this contention purports to demonstrate an irregularity in respondents' motion for summary judgment, it really functions as a substantive argument that respondents should be estopped from raising a statute of limitations defense. We therefore construe it as such.

Respondents contend Stein established no triable issue of fact as to his section 1983 claim because he had no protected property interest, he lacked standing to bring the action, the action was untimely, and in any case, the individual respondents are entitled to qualified immunity. Stein did not directly address the first and third arguments, perhaps intending his previous arguments about property rights and estoppel to apply generally to both his inverse condemnation and section 1983 claims. On the standing issue, Stein rehashed his prior argument that he has direct standing to sue as described in section III of his reply brief because of the diminution of value in KTF. Stein also argued the individual respondents are not entitled to "the discretionary immunity defense," by which we assume he meant "qualified" immunity defense, because respondents "have never been able to show any reasonable basis" for the conditions imposed on KTF.

32

## B. Analysis

The essential elements of a section 1983 claim are: (1) the conduct complained of was committed by a person acting under color of state law, and (2) the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.[15] (§ 1983) "Section 1983 is not itself a source of substantive rights, ' "but merely provides 'a method for vindicating federal rights elsewhere conferred.' " ' " (*McAllister v. Los Angeles Unified School Dist.* (2013) 216 Cal.App.4th 1198, 1207.) One cannot go into court claiming only a violation of section 1983. (*Chapman v. Houston Welfare Rights Organization* (1979) 441 U.S. 600, 615-617 [60 L.Ed.2d 508, 521-522].)

We turn first to the question of whether Stein has standing to bring a section 1983 claim. The trial court correctly found Stein lacks standing to bring a section 1983 claim for injuries that allegedly occurred during the Colemans' ownership of KTF. Section 1983 claims must be based upon a violation of Stein's personal rights, not the rights of someone else. (§ 1983; *Rose v. City of Los Angeles* (C.D.Cal. 1993) 814 F.Supp. 878, 881.) Stein, perhaps recognizing the flaws in his section 1983 claim as assigned by the Colemans, asserts on appeal that he has standing to sue on his own behalf -- including, presumably, for his section 1983 claim.

We therefore consider whether Stein can bring a section 1983 claim for respondents' alleged actions during Stein's ownership of KTF. Stein bases his claim on "deprivation of property without due process of law . . . notice or opportunity to be heard." Although Stein does not specify as much, this claim appears to be for alleged

---

[15] We note "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." (*Will v. Michigan Dept. of State Police* (1989) 491 U.S. 58, 71 [105 L.Ed.2d 45, 58].) As the trial court recognized in its ruling on demurrer, and as reflected in Stein's subsequent SAC, Stein's section 1983 claim is thus against the individual respondents in their individual capacities only.

violation of procedural due process.  (See *Collins v. City of Harker Heights, Tex.* (1992) 503 U.S. 115, 125 [117 L.Ed.2d 261, 273] [Procedural due process is "a guarantee of fair procedure in connection with any deprivation of life, liberty, or property by a State," while substantive due process "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.' "].)

A procedural due process claim under section 1983 requires proof of the following:  (1) a protectable liberty or property interest, and (2) a denial of adequate procedural protections.  (*Thornton v. City of St. Helens* (9th Cir. 2005) 425 F.3d 1158, 1164 (*Thornton*).)  To have a property interest in a government benefit like the transfer of a state operating license, Stein must have "a legitimate claim of entitlement to it." (*Board of Regents v. Roth* (1972) 408 U.S. 564, 577 [33 L.Ed.2d 548, 561].)  Such a claim must be more than a "unilateral hope," and the mere fact that Stein received renewals "in the past, even for a considerable length of time, does not, without more, rise to the level of a legitimate claim of entitlement."  (*Doran v. Houle* (9th Cir. 1983) 721 F.2d 1182, 1186 (*Doran*); see also *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1180 (*Clark*).)

Whether a statute creates a property interest in the renewal of an existing operating license depends on the extent to which that statute contains mandatory language that restricts the discretion of the reviewing body to deny renewal to applicants who claim to meet the statutory requirements.  (*Thornton, supra*, 425 F.3d at p. 1164.)  In other words, the asserted property interest turns on whether " 'the local agency lacks *all* discretion to deny issuance of the permit or to withhold its approval.  Any significant discretion conferred upon the local agency defeats the claim of a property interest.' "  (*Clark, supra*, 48 Cal.App.4th at p. 1180.)  " '[A] cognizable property interest exists "only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured." ' "  (*Ibid.*)  Moreover, the local agency's opportunity to deny issuance suffices to defeat the claim of a federally protected property interest even

if, in a particular case, " ' "objective observers would estimate that the probability of issuance was extremely high." ' " (*Id.* at pp. 1180-1181.)

Here, Stein essentially asserts a property interest in the transfer of his compliance agreement to new owners of KTF under identical or similar terms, or at least less restrictive terms than the registration conditions imposed on the Colemans in 2007. His theory is ostensibly that such renewal is the only way to actualize his investment in KTF's property value.

Compliance agreements with respondents are not governed directly by statute, but by California Code of Regulations, title 14, section 245, which in turn is authorized by broad terms under Fish and Game Code section 15500 et seq. The regulation provides that "[w]hen diseases/pathogens are identified by a fish pathologist in aquatic plants or animals in an aquaculture facility . . . which require restrictive action by [respondents], . . . [¶] . . . a compliance agreement describing the action to be taken *may* be drawn up between the owner and the director." (Cal. Code Regs., tit. 14, § 245, subd. (a)(2)-(3), italics added.) Importantly, nowhere does section 245 specify circumstances under which a compliance agreement *must* issue, nor does it provide for mandatory renewal of compliance agreements or transfer to purchasers of a facility. Indeed, Stein does not cite specific language from this regulation, or any other legal authority, which would qualify as "mandatory language" restricting respondents' discretion to deny compliance agreement renewals.

Stein, in his briefing, makes multiple assertions to the effect that nothing *prohibited* transferring compliance agreements. These assertions are inapposite; even if transferring compliance agreements was *allowed*, it would not follow that such transfers were therefore *mandatory*, so as to give Stein a property interest therein for purposes of bringing a section 1983 claim.

Stein also complains that respondents circumvented California Code of Regulations, title 14, section 245's "requirements" and "protections of the economic

35

interests of a trout farmer." Stein cites to no specific language in section 245, but broadly claims the regulation "recognized that his right to continue to raise and plant trout from [KTF] was of financial benefit, and that benefit extended to his right to recoup the value of his investment on retirement, lease or sale." Section 245 contains no such language. The closest provision in the regulation to Stein's assertion is the requirement that compliance agreements "shall be designed in consultation with the Aquaculture Disease Committee to bring the least amount of economic hardship possible to the affected party while affording maximum protection to other growers and the fishery resources of the State." (Cal. Code. Regs., tit. 14, § 245, subd. (a)(3).) This provision requires respondents to consider the economic impacts of compliance agreements on private owners, but it in no way *mandates* the specific property interest Stein seems to claim.[16]

In sum, Stein failed to show that any statute or regulation restricted respondents' discretion to decline to transfer his compliance agreement to the Colemans. (See *Thornton, supra*, 425 F.3d at p. 1164.) Indeed, Stein's claim seems based entirely on the theory that he renewed his compliance agreement in the past "for a considerable length of time," (*Doran, supra*, 721 F.2d at p. 1186) and thus developed a unilateral expectation that the agreement would transfer to the Colemans. Stein argues, for example, "In the

---

[16] For example, Stein seems to suggest respondents could not attempt to gradually phase out trout farms in Mc endemic waters (e.g., by refusing to issue registrations to new owners) without running afoul of section 245's requirement that private economic interests be considered. Section 245 does not, however, dictate any details of how respondents are supposed to weigh private economic interests against public protection. (Cal. Code. Regs., tit. 14, § 245, subd. (a)(3).) Here, respondents considered private economic interests as required by section 245, and struck what they deemed the appropriate balance by allowing established trout farmers to continue operations under compliance agreements but declining to renew those agreements for new owners. This balance may not have created a favorable result for Stein, but it does not follow from Stein's dissatisfaction that respondents' decision was unlawful or somehow deprived Stein of a property interest.

past, interruptions, changes in the form of ownership of the premises, or change in operation of [KTF] by lessees, had in no way affected the continuing right to plant trout from [KTF] in designated areas under the 'Compliance Agreement.' " But as noted *ante*, these facts cannot support a "legitimate claim of entitlement" for purposes of a procedural due process claim under section 1983. (*Doran*, at p. 1186.)

Some of Stein's arguments suggest he might have intended to bring a substantive due process claim in addition to or instead of a procedural due process claim.[17] But even if we considered his arguments under a substantive due process analysis, they would still fall short of establishing a valid section 1983 claim.

First, to assert a deprivation of substantive due process, Stein must establish a federally protected property interest. (*Vieira Enterprises, Inc. v. City of East Palo Alto* (2012) 208 Cal.App.4th 584, 595-596, quoting *Clark, supra*, 48 Cal.App.4th at p. 1184.) As discussed *ante*, Stein has not met this requirement. Even assuming arguendo that he had established a "cognizable property interest," section 1983 requires more than "evidence that a government decision was arbitrary and capricious." (*Vieira Enterprises*, at p. 596.) In *Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1033 (*Galland*), the California Supreme Court set forth its formulation of the "appropriate substantive due process standard for determining when an administrative body charged with implementing a law acts erroneously in such a way as to injure an individual's economic

---

[17] For example, in his SAC, Stein complained of "arbitrary and capricious governmental activity" "without any rational basis" and "without the authority of law." On appeal, he argues that respondents made "misguided, arbitrary and overreaching" decisions "off the cuff, on a random, ad hoc basis," and that respondents' policies were " 'underground,' unreasonable and arbitrary," "capricious," and "improper." (Cf. *County of Sacramento v. Lewis* (1998) 523 U.S. 833, 845-846 [140 L.Ed.2d 1043, 1057] [Substantive due process prohibits "the exercise of power without any reasonable justification in the service of a legitimate governmental objective" and "protects against government power arbitrarily and oppressively exercised."].)

and property interests." Stein " 'must at least show that state officials are guilty of grave unfairness in the discharge of their legal responsibilities. Only a substantial infringement of state law prompted by personal or group animus, or *a deliberate flouting of the law that trammels significant personal or property rights*, qualifies for relief under § 1983. [Citation.] Inadvertent errors, honest mistakes, agency confusion, even negligence in the performance of official duties, do not warrant redress under this statute.' " (*Id.* at p. 1034.)

Stein has not shown anything like the conditions described in *Galland*. Throughout his briefing, Stein complains of numerous actions by respondents that supposedly were misleading or constituted bad policy; but as discussed *ante*, Stein shows no " 'substantial infringement of state law' " (*Galland, supra*, 24 Cal.4th at p. 1034), much less " 'personal or group animus' " (*ibid.*), nor does he contend any errors made by respondents exceeded the bounds of inadvertence, honest mistake, agency confusion, or negligence, so as to constitute " '*deliberate flouting of the law that trammels significant personal or property rights*' " (*ibid.*).

For example, Stein mentions repeatedly that Cox said, in writing, that KTF's compliance agreement would be rewritten for new owners. This allegation refers to Cox's e-mail dated March 6, 2006, in which Cox said, "I shoul[d] talk to you about the existing compliance agreement. That would be re-written for the new owner, and I'd like to discuss that with you." However, Stein overlooks Cox's deposition testimony, wherein he said, "[M]y intent in writing this [e-mail] was to let Paul know that the existing compliance agreement would be different for -- the set of restrictions would be different for a new owner than they were for the current owner." This evidence, as explained *ante*, casts doubt on Stein's claim that he "justifiabl[y] reli[ed]" on a clear guarantee that his compliance agreement would transfer, essentially unchanged, to the Colemans. Moreover, Stein does explicitly cite to the immediately preceding sentence in Cox's testimony, where Cox said, "I was mistaken in assuming that we would be

rewriting a compliance agreement." This uncontested evidence suffices to demonstrate that even to the extent Cox erred in handling Stein's situation, the error was inadvertent, not an abuse of governmental power as an instrument of oppression. (See *Galland, supra*, 24 Cal.4th at p. 1034.) There is no evidence to the contrary.

As another example, Stein repeatedly asserts that respondents implemented an " 'underground regulation,' " based apparently on the use of that term in Cox's August 24, 2007, e-mail. Initially, we note that even if respondents indeed worked through underground regulations, this would, at best, tend to support a claim for violation of procedural due process; but as previously discussed, Stein cannot prove such a claim. Under the substantive due process framework, evidence of such underground regulation as Stein describes is wholly insufficient to establish a constitutional violation. In fact, the very e-mail upon which Stein bases his entire theme of underground regulation actually evinces respondents' sincere intent to act in accordance with the law and requirements of due process. In that e-mail, Cox noted that the point of limiting registration was to eventually phase out Mc positive sites to benefit the State by preventing the planting of diseased fish -- a goal that even Stein concedes is "arguably supportable or reasonable" -- but expressed *concern* that such policies might "smack[] of underground regulation." Similarly, Cox specifically said in another e-mail that respondents needed to offer Stein and the Colemans the option to test fish at KTF for whirling disease "to deal with all aquaculture registration applications in a consistent manner." These communications do not indicate animus to substantially infringe or flout the law, or to abuse governmental power; on the contrary, they show that, whatever the deficiencies in respondents' handling of Stein's situation might have been, they were not so egregious as to constitute a violation of substantive due process.

We therefore conclude Stein failed to show a violation of due process to support his section 1983 claim. Since this suffices to defeat Stein's section 1983 claim, we need

39

not reach the additional issues of timeliness or estoppel, or the individual respondents' assertion of qualified immunity.

Throughout the opening brief Stein makes isolated comments to the effect that he needs only show a triable issue of material fact, or that respondents failed to actually show the absence of any disputed material facts. None of these comments, however, are accompanied by any explanation or analysis of how Stein has actually shown triable issues of material fact.[18]

We are not obliged to search the record to ascertain whether it supports Stein's contentions or develop his arguments for him. (*Green v. Green* (1963) 215 Cal.App.2d 31, 35.) Insofar as Stein's briefing does not demonstrate the trial court was wrong, but merely challenges respondents to prove the court was right, Stein fails to establish that the trial court erred in granting respondents' motion for summary judgment. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115-1116.) Otherwise, as discussed *ante*, Stein has not shown a triable issue of material fact to preclude judgment in respondents' favor on either the inverse condemnation cause of action or section 1983 claim. Summary judgment was properly granted.

---

[18] Stein does argue elsewhere in his opening brief that his declaration qualifies as a showing of material factual disputes. The purported "dispute" is essentially that the Colemans believed Neil Manji's November 5, 2007, letter constituted a final determination regarding conditions on KTF, while Stein believed the conditions to be temporary. Stein complains the trial court ignored this "issue of material fact" and "engaged in issue determination as opposed to issue spotting." As the trial court explained, however, the issue of material fact pertinent to Stein's causes of action was not whether the November 5, 2007, letter was *actually* final, but whether the Colemans *believed* it was final. Stein's testimony might suggest the Colemans' belief was wrong, but could not raise a triable issue of material fact as to whether the Colemans nonetheless had that belief.

## DISPOSITION

The judgment is affirmed.  Appellants shall pay respondents' costs on appeal. (See Cal. Rules of Court, rule 8.278(a)(1), (5).)


                                       MURRAY          , J.


We concur:


          ROBIE           , Acting P. J.


          MAURO           , J.